UNITED STATES DISTRICT COURT.
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 04-10117-RWZ |
| | ) |
| DARREN FRANKLIN, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO SUPPRESS EVIDENCE
## AND REQUEST FOR ORAL ARGUMENT

Comes now the United States of America, by and through the undersigned counsel, and submits herewith its Opposition to Defendant's Motion to Suppress Evidence and Request for Oral Argument. Defendant Darren Franklin has moved to suppress the drug evidence seized from the trunk of his car and the firearms evidence seized from his girlfriend's apartment on the grounds that neither seizure was permitted pursuant to any exception to the Fourth Amendment's warrant requirement. However, Franklin's suppression motion should be denied in its entirety because Franklin himself consented to the warrantless search of his car and both Franklin and his girlfriend consented to the search of her apartment. Nor is an evidentiary hearing necessary to establish valid consent to both searches, since the search of Franklin's car also was justified pursuant to the automobile exception to the warrant requirement and the items recovered from both the car and the apartment is admissible by virtue of the inevitable discovery doctrine.

I.                           **STATEMENT OF FACTS**

On April 14, 2004, a federal grand jury returned a sealed Indictment charging defendant Darren Franklin ("Franklin") with three substantive distributions of cocaine base (also known as "crack cocaine"), in violation of 21 U.S.C. § 841(a)(1), on May 8 and July 10, 2003 and on March

12, 2004.[1] This was one of several indictments stemming out of a roughly year-long investigation by local, state and federal law enforcement agencies of drug-trafficking and related crimes in the area surrounding the Warren Gardens housing development in the Roxbury section of Boston.[2] See Transcript of Testimony of DEA Task Force Agent George MacLaughlin at April 23, 2004 Detention Hearing ("Tr."), a copy of which is attached hereto for the Court's convenience at Tab A, at 5. Most of the defendants were arrested in a coordinated manner on the night of April 14 and in the early morning hours of April 15, 2004. Franklin was one of two targets of the investigation who were believed to be the middle level suppliers of crack cocaine to the street-level dealers in the Warren Gardens area. Tr. at 8.

In deciding to detain Franklin pending a trial on the instant charges, Magistrate Judge Cohen described Franklin's criminal record as follows:

> The defendant has a lengthy and significant criminal record, both juvenile and adult, beginning in 1989. . . . Among other things: Some eighty-eight (88) criminal charges, more or less, have been brought against the defendant since 1989. Over the course of that prior criminal record, some thirty-two (32) defaults, including some seven (7) default <u>warrants</u>, have issued against the defendant. He has been adjudicated delinquent and convicted on eleven narcotics charges in the past. He was adjudicated delinquent or convicted of crimes of violence (i.e., assault and battery,

---

[1]    The Indictment also charged that the first and third substantive distributions involved 5 or more grams of cocaine base and that the first and second distributions occurred within a school zone in violation of 21 U.S.C. § 860(a).

[2]    In addition to Franklin, sixteen other individuals were charged in federal court with trafficking in crack cocaine in the Warren Gardens area. See <u>United States v. Roland Worrell</u> (Criminal No. 03-10382-WGY); <u>United States v. Stephen A. Williams</u> (Criminal No. 04-10026-PBS); <u>United States v. Gerald Anderson, et al.</u> (Criminal No. 04-10110-RWZ); <u>United States v. Jermaine Anderson, et al.</u> (Criminal No. 04-10111-MEL); <u>United States v. Justin Teal, et al.</u> (Criminal No. 04-10112-RGS); <u>United States v. Carlos Barrientos</u> (Criminal No. 04-10113-DPW)(also charged as a felon-in-possession); <u>United States v. Antonio Cardona, et al.</u> (Criminal No. 04-10114-DPW); and <u>United States v. Spencer Gray et al.</u> (Criminal No. 04-10115-RCL). Another eight defendants were prosecuted in state courts.

assault and battery with a dangerous weapon, and threatening) on some six different occasions. On two occasions, he was convicted on charges of giving a false name to police officers upon his arrest. And, most importantly, he has been convicted on some twenty-four (24) different offenses, including distribution of narcotics offenses, receiving stolen property, firearms offenses, providing false identification upon arrest, and assault and battery with a dangerous weapon, <u>while on pretrial release</u>.

May 4, 2004 Memorandum and Order on Government's Motion for Detention ("Detention Order") at 8 (emphasis in the original; footnotes omitted).

On the night of April 14, surveillance established in the vicinity of the apartment of Franklin's girlfriend, Fania Hemingway, established the likelihood that Franklin would be spending the night there. Tr. at 23-25. Ms. Hemingway's residence was located at 159 Pine Grove Drive, Brockton, Massachusetts, in a complex of approximately 8-10 three-storey apartment buildings and associated access roads and parking lots. During the course of the surveillance on the night of April 14-15, Franklin was seen two or three times by surveillance officers prior to his arrest.

At approximately 11:30 p.m., Detective Robert Fratalia of the Boston Police Department's Youth Violence Strike Force saw a man who was later identified as Franklin exit the building in which Ms. Hemingway's apartment was located and get into the front passenger seat of a white motor vehicle which then departed the area and returned approximately 20-30 minutes later, when Franklin returned to Ms. Hemingway's second-floor apartment. <u>See</u> Detective Fratalia's Surveillance Worksheet ("Fratalia Surv."), a copy of which is attached hereto at Tab B, at p. 1;[3] and Tr. at 23.

The entrance to 159 Pine Grove Drive has three doors protected by an ornamental canopy. <u>See</u> the first of the digital photographs (C-1) attached hereto at Tab C. The door to the apartment

---

[3]    As indicated in that same report, a surveillance unit attempted to follow the car in which Franklin was riding but lost it in traffic. <u>Id.</u>

leased by Ms. Hemingway is on the right. As one proceeds through the front courtyard of 159 Pine Grove Drive to the side of that building, there is an exterior staircase leading down to a parking lot with "head-on," marked parking spaces for the cars of apartment-complex residents. See photographs C-2 and C-3 at Tab C. That parking lot is bounded on one side by an access road which is visible in the left background of photograph C-3 and which traverses the middle of photograph C-4. Inside that parking lot and at the edge of the access road is a blue dumpster surrounded by a wooden fence. That dumpster is visible on the left side of photographs C-4 and C-5. As already mentioned, the access road passes on the other side of the dumpster. The access road has marked, parallel parking spaces for visitors to the apartment complex. One such parking space is visible in foreground of photograph C-6 and the staircase behind Ms. Hemingway's apartment building is visible in the rear left of that photograph. It was in this space that Franklin's car was parked on the night of April 14 into the morning of April 15.

At approximately 1:25 a.m., Detective Fratalia observed Franklin walking down the steps depicted in photographs C-2, C-3, C-4 and C-6. Fratalia Surv. at 2; and Tr. at 23-24. He saw Franklin walk over to a blue Ford Taurus which Franklin had been seen driving on numerous occasions during the course of the underlying investigation. Detective Fratalia then saw Franklin place a light-colored bag into the trunk of his car, close the trunk, get into the car, start the car, turn on the headlights and move the car slightly forward before turning off the lights. After a couple of minutes (during which time Detective Fratalia could not determine if the car was still running or not), Franklin exited his car and walked back up the staircase in the direction of 159 Pine Grove Drive. Fratalia Surv. at 2 and Tr. at 23-24.

Sometime later that same morning, Detective Fratalia observed a tow truck entering the

apartment complex with a motor vehicle in tow. The tow truck had a loud engine and amber flashing lights. It stopped next to the area in which Franklin's car was parked. While it was stopped, Detective Fratalia saw an individual whom he could not identify come to a window of what he believed was Ms. Hemingway's apartment. That individual appeared to watch the actions of the tow truck driver and stayed in the window for another minute or so after the tow truck had left the area. Fratalia Surv. at 2.

Aware that Ms. Hemingway's two small children might well be with her and Franklin inside her apartment on the morning of April 15, law enforcement officers decided not to enter the apartment to effectuate Franklin's arrest if they could avoid doing so. Tr. at 24-25. Instead, sometime after 5:00 a.m. on April 15, they placed several telephone calls into the apartment, advised Franklin that they were outside the apartment building and that they had a federal warrant for his arrest and urged him to surrender peacefully. Id. Eventually, at approximately 5:15 - 5:30 a.m., Franklin exited the front door of Ms. Hemingway's apartment carrying a cellular telephone and a set of keys in one hand and a weighted blue plastic bag in the other hand. Tr. at 24-25; Fratalia Surv. at 2; and DEA-6 Report entitled "04-15-04 arrest of Darrin [sic] FRANKLIN and seizure of Exhibits 52, 53, 54 and N-116 to N-124" ("DEA-6"), a copy of which is attached hereto at Tab D, at para. 6. Franklin was directed to put down the items he was carrying and he was taken into custody and handcuffed. Tr. at 25-26; Fratalia Surv. at 2; and DEA-6 at para. 6. The blue plastic bag Franklin had brought out of the apartment with him was found to contain 438 rounds of ammunition.[4] Tr. at 26-27 and Count Five of the Second Superseding Indictment.

---

[4]    Franklin has not moved to suppress the seizure of the ammunition which, in light of Franklin's extensive criminal record, exposes him to a mandatory minimum fifteen-year prison sentence as an Armed Career Criminal.

Franklin was taken out of the courtyard in front of 159 Pine Grove Drive, down the exterior staircase and into the parking lot behind the apartment building where he remained in the custody of DEA Special Agent Michael Cashman and DEA Task Force Agent George MacLaughlin (a veteran Milton Police Department Detective). Tr. at 3-4, 47 and 51. In S/A Cashman's presence, TFA MacLaughlin read Franklin his Miranda rights and Franklin indicated that he understood those rights. Tr. at 27 and DEA-6 at para. 7. Franklin has not moved to suppress any of the Mirandized statements which he made and of which he was advised during the course of the detention hearing, as part of automatic discovery and in the form of police reports provided to him.

The agents told Franklin that he had been seen carrying out a bag and putting it in the trunk of his parked car. Franklin confirmed that the car in question was his and that he appeared on the insurance policy, even though the vehicle was registered in his mother's name. The agents asked him what was in the bag and Franklin said it contained "a little 'weed'" (meaning marijuana). When asked why he had placed the bag of marijuana in the trunk of his car, Franklin replied by indicating that he had received a telephone call alerting him to the fact that "his people were disappearing off the street," meaning that other members of the Warren Gardens crew were being systematically arrested. Franklin indicated that he knew it was just a matter of time before the police came for him and he did not want Ms. Hemingway to get into trouble on account of the ammunition or drugs which would be found in her apartment if he had left them there. He also indicated that, a few days earlier, while parked on Pine Grove Drive, he had observed what he believed was a police officer sitting in a car parked behind him. DEA-6 at para. 7 and Tr. at 29 and 52.

TFA MacLaughlin and S/A Cashman asked for consent to search Franklin's car and Franklin

replied to the effect "Yeah, go do what you got to do." DEA-6 at 7.[5] The keys to Franklin's car had been among the keys which he had held in his hand when he had exited Ms. Hemingway's apartment, but TFA MacLaughlin had turned them over to Ms. Hemingway after Franklin was initially taken into custody. Tr. at 49-50. Accordingly, TFA MacLaughlin retrieved Franklin's car keys from Ms. Hemingway and, together with S/A Cashman, proceeded to search Franklin's car. In the trunk of Franklin's car, they found a white bag which contained a tan and red Nike shoebox and a blue plastic Gillette bag. The Gillette bag contained approximately 91 grams of marijuana as well as approximately 66 grams of crack cocaine. DEA-6 at para. 8 and Tr. at 29-30. No other contraband and, in particular, no firearm was found in Franklin's car.

In the meantime, back in her apartment, Detective Fratalia had advised Fania Hemingway of her rights[6] and, at approximately 5:50 a.m., Ms. Hemingway, who was never placed under arrest, had executed both a written waiver of her Miranda rights and a written consent to search her apartment. Fratalia Surv. at 2 and Waiver of Rights Form and Consent to Search Form executed by Ms. Hemingway, copies of which are attached hereto at Tab E. Ms. Hemingway told Detective Fratalia that she had been living at 159 Pine Grove Drive with her children since February of 2002; that Franklin was her boyfriend; that they were both unemployed; that she suspected that Franklin made money illegally; and that Franklin stayed at her apartment on average four or five nights a

---

[5]     At the detention hearing, TFA MacLaughlin testified on direct examination that, after being asked for consent to search the car, Franklin "paused and he said, ['go do what you've got to do.[']" Tr. at 29. On cross-examination, TFA MacLaughlin testified that "I said ['do you mind if we look [in the trunk of the car']? And he said ['no, do, do what you've got to do.[']" Tr. at 52-53.

[6]     Ms. Hemingway was known to Detective Fratalia, who was aware that she previously had been convicted of a crack cocaine-trafficking offense in federal court in the District of Massachusetts.

7

week. Fratalia Surv. at 2-3. Ms. Hemingway told Detective Fratalia that Franklin had a blue Ford Taurus which was parked out by the dumpster. She also indicated that, during the night of April 14-15, she saw two bags on the living room floor located at the top of the stairway leading into her unit. Ms. Hemingway indicated that she did not know what was in the bags, but that, later that same night and prior to his arrest, Franklin had placed one of bags in his car (which she believed contained a Nike shoe box) and had taken the second bag outside with him when he had surrendered to the police. Fratalia Surv. at 3.

Ms. Hemingway testified before a federal grand jury and described Detective Fratalia as asking "me could they search my house because, in the blue bag, there were bullets, so they asked for consent to search my house, and I gave them permission." See Transcript of Grand Jury Testimony of Fania Hemingway ("Hemingway Tr."), a copy of which is attached hereto at Tab F, at 20-21. She testified under oath that Detective Fratalia told her that "I could have refused to not [sic] let them search, and they would have had to go and request a search warrant" and explained that "I didn't see any reason to say no." Hemingway Tr. at 22. Ms. Hemingway further testified that she did not feel pressured into consenting to the search and that she signed the consent form freely and with knowledge of her rights. Id. She also testified that she learned that Franklin had consented to the search only after she had given her consent. Hemingway Tr. at 23.

TFA MacLaughlin also testified at the detention hearing that, after Detective Fratalia had obtained consent to a search of the apartment from Ms. Hemingway, he suggested to TFA MacLaughlin that they also attempt to secure Franklin's consent to such a search. Tr. at 51. Accordingly, TFA MacLaughlin returned to the parking lot and asked Franklin if Franklin contributed financially to the costs of leasing the apartment an Franklin indicated that he "'help[ed]

8

out." Tr. at 51. See also Hemingway Tr. at 23 (wherein Ms. Hemingway testified that "[h]e [Franklin] helps out sometimes, but I primarily pay the bills.") TFA MacLaughlin then told Franklin "I want to get permission from you to search your apartment, consent to search your apartment, and [Franklin] said, [']yes, go ahead, do what you've got to do.[']" Tr. at 51. See also DEA-6 at para. 9 (wherein Franklin is described as giving an affirmative response saying "in essence, [']ya; go ahead, do your thing, do what you got to do[']"). Somebody then called or radioed to Detective Fratalia that Franklin had been asked for and had given his consent to a search of the apartment. Hemingway Tr. at 23.

At approximately 6:10 a.m., Detective Fratalia and TFA MacLaughlin began to search Ms. Hemingway's apartment. Fratalia Surv. at 3. During the search, they found a large capacity extended pistol magazine and one .40 caliber bullet inside an open safe which was located under the bed and behind a piece of plywood in Ms. Hemingway's bedroom. DEA-6 at para. 9.

At around the same time that the search of Ms. Hemingway's apartment was underway, another group of law enforcement officers approached the residence of Franklin's mother, Emily Franklin, and her husband, Preston McNeil, at 370 Chestnut West in Randolph, Massachusetts. DEA-6 at paras. 10 and 12. Ms. Franklin and Mr. McNeil both executed a written consent for a search of the apartment and led the officers to a small bedroom which they indicated formerly had been her son's bedroom and which still contained some of his possessions, but to which they enjoyed unrestricted access. DEA-6 at para. 12. This search yielded letters and personal papers belonging to Franklin; a quantity of powder cocaine; a quantity of crack cocaine; two boxes of ammunition; and a floor safe containing a fully loaded .45 caliber Glock semi-automatic pistol, a fully loaded .45 caliber magazine and two boxes of .45 caliber ammunition. DEA-6 at paras. 15-17.

9

On May 27, 2002, a Superseding Indictment was returned adding two counts to the three substantive crack cocaine distributions alleged in the original Indictment. In Count Four, Franklin was charged with possession with intent to distribute the 66 grams of crack cocaine retrieved from the trunk of his car on the morning of his arrest. In Count Five, Franklin was charged with being a felon in possession of the 438 rounds of ammunition which he brought with him in a blue plastic bag when he surrendered to police outside of Ms. Hemingway's apartment. On October 28, 2004, a Second Superseding Indictment was returned which contained precisely the same charges as the (first) Superseding Indictment, but also contained a "Notice of Additional Factors" to bring the indictment into compliance with the Supreme Court's <u>Blakely</u> decision, in the event that that ruling applies to the U.S. Sentencing Guidelines.

**II.**                                              **ANALYSIS**

Franklin has filed a one-page Motion to Suppress Evidence, supported by a three-page memorandum of law and his own three-page affidavit. Franklin seeks to suppress the drugs seized from the trunk of his car and the firearms evidence seized from "his apartment" (Defendant's Motion to Suppress Evidence) at "159 Pine Grove Street" [sic] (Affidavit of Defendant at para. 2).[7] Franklin has not moved to suppress either his Mirandized statements to law enforcement officers on the morning of his arrest or the evidence seized from his parents' residence in Randolph that same morning.

---

[7]   As indicated earlier, the apartment in question is located at 159 Pine Grove <u>Drive</u>. Hemingway Tr. at 7. Franklin acknowledges that the lease was in the name of Ms. Hemingway, but asserts that they "had been living together since September, 2003 . . . ." Affidavit of Defendant at para. 2. However, Ms. Hemingway testified under oath that they began dating in September of 2002, that Franklin began spending time at her apartment "around Thanksgivingtime" [sic] and that he began spending an average of five nights a week at her apartment in early 2003. Hemingway Tr. at 7-8.

Franklin's motion should be denied because the warrantless search of his car was conducted with his consent and because the warrantless search of Ms. Hemingway's apartment required only her consent, although his consent also was sought and obtained. Nor is any evidentiary hearing required to resolve Franklin's motion, since the search of his car also was permissible under the automobile exception to the Warrant Clause of the Fourth Amendment and since the evidence seized from both his car and his girlfriend's bedroom is admissible in any event by application of the doctrine of inevitable discovery.

1.    **The Drugs Retrieved from the Trunk of Franklin's Car Were Seized Pursuant to a Valid Consent Search:**

"[O]ne of the specifically established exceptions to the [Fourth Amendment] requirements of both a warrant and probable cause is a search that is conducted pursuant to consent" and the government bears the burden of proving by a preponderance of the evidence whether such consent was given. Schneckloth v. Bustamente, 412 U.S. 218, 219 (1973). The question of whether or not consent was given is determined based on the totality of all the circumstances. Id.; and United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002)(asking "what would the typical reasonable person have understood by the exchange between the officer and the subject?")(citation and internal quotation marks omitted). Where the language used to give consent or to limit the scope of the consent is arguably ambiguous, courts "look beyond the language of the consent itself, to the overall context," which necessarily encompasses contemporaneous statements and actions by the persons at the scene. Melendez, 301 F.3d at 32 (citation and internal quotation marks omitted).

A valid consent to search "may be in the form of words, gesture, or conduct." United States v. Griffin, 530 F.2d 739, 742 (7th Cir. 1976)(consent found where defendant, who had denied police

officers' first request for access to his apartment and had shut his door, reacted to their second request by stepping back into the apartment and leaving the door partially open) citing Robbins v. MacKenzie, 364 F.2d 45, 48-49 (1st Cir. 1966)("When a householder, knowing the identity and purpose of his caller, opens his door and turns back inside, he expresses by his actions as adequate a consent to entry as he would by a verbal invitation"). See also United States v. Raibley, 243 F.3d 1069, 1072 (7th Cir. 2001)(consent found where defendant looked away and shrugged his shoulders when police officer indicated he would like to view the videotapes found during a consent search of defendant's pickup truck); and United States v. Wilson, 895 F.2d 168, 172 (4th Cir. 1990)(defendant shrugged his shoulders and raised his arms when asked for consent to pat-down search).

The fact that Franklin was in custody is a factor in considering whether he gave his consent and whether that consent was voluntary, but it is by no means dispositive, since appellate courts frequently have found defendants in custody to have given valid consent to a search. See, e.g., United States v. Trueber, 238 F.3d 79, 95 (1st Cir. 2001); Raibley, 243 F.3d at 1072; United States v. Christian, 571 F.2d 64, 66 (1st Cir. 1978); and United States v. Cepulonis, 530 F.2d 238, 243-244 (1st Cir. 1976). To find voluntary consent, it is not necessary for a defendant's consent to have been communicated in a light-hearted and fullsome manner. "Bowing to events, even if one is not happy about them, is not the same thing as being coerced. . . ." United States v. Miller, 589 F.2d 1117, 1132 n.13 (1st Cir. 1978); see also United States v. Barnett, 989 F.2d 546, 556 (1st Cir. 1993)(defendant found to have given consent when he responded to request to conduct search by saying "Go ahead. You'd probably get a search warrant anyway"). The factors to be weighed include a defendant's prior experience with law enforcement authorities. Barnett, 989 F.2d at 556; and

Cepulonis, 530 F.2d at 244. In Franklin's case, the agents were dealing with an individual against whom, as Magistrate Judge Cohen observed in ordering Franklin's detention, "[s]ome eighty-eight (88) criminal charges, more or less," had been brought since 1989; an individual who "has been adjudicated delinquent and convicted on eleven narcotics charges in the past" and who "was adjudicated delinquent or convicted of crimes of violence (*i.e.*, assault and battery, assault and battery with a dangerous weapon, and threatening) on some six different occasions." Detention Order at 8.

When asked for consent to search his car, Franklin responded affirmatively. DEA-6 at para. 7 and Tr. at 52-53. Nor has Franklin challenged the accuracy of either the written report or of TFA MacLaughlin's sworn testimony with respect to how Franklin responded to the request for permission to search his car. He has only asserted in a conclusory manner "I did not give my consent." Affidavit of Defendant at para. 6.[8] Even if one assumes for the sake of argument that Franklin's words themselves were ambiguous, the totality of the circumstances surrounding Franklin's response strongly indicates that he was in a generally cooperative mood, intended to and did give his consent to search his car.

As previously noted, Franklin exited Ms. Hemingway's residence carrying **438 rounds of ammunition**. He apparently did this in order to avoid legal problems for his girlfriend, who had a recent federal felony drug conviction. Franklin had to have known that he was (literally and figuratively) providing the authorities with the ammunition for a felon-in-possession charge against him. He also elected to bring his keys, including his car keys, with him in one of his outstretched

---

[8]    Indeed, at the detention hearing, Franklin's attorney questioned not the content of Franklin's response but TFA MacLaughlin's understanding that Franklin's response amounted to consent. Tr. at 53.

hands when he submitted to the police. He was subsequently Mirandized by TFA MacLaughlin and answered freely questions about the car which was the subject of the search, stating that it was registered to his mother but acknowledging that he was listed on the insurance policy (not a fact readily ascertainable by the police at the scene) and that he drove the car.

Still more significantly, Franklin has not denied admitting to TFA MacLaughlin and S/A Cashman that he had placed drugs in the trunk of the car the night before upon learning that "some of his boys" were being arrested. Such admissions are further evidence of Franklin's overall cooperative frame of mind. Franklin has not argued (but might) that it is illogical to conclude that Franklin would have consented to the search of his vehicle after having admitted placing contraband inside it. Nevertheless, the First Circuit has previously found that a defendant's knowledge of "the incriminating contents of the [location to be searched] do[es] not necessarily belie consent: 'A defendant may believe that (a) search is ultimately inevitable whether he consents or not. In such circumstances a suspect might well feel he is better off to consent than to oppose.'" Cepulonis, 530 F.2d at 244 (citation omitted). Indeed, in this case, once Franklin admitted that he had placed drugs in the trunk of the car, he must have realized that the agents would have no trouble obtaining a warrant to search the car.

Thus, Franklin's response to the request for permission to search his car clearly conveyed his consent to such a search and, even if one assumes for the sake of argument that his response was subject to misinterpretation, the totality of the circumstances surrounding his exchange with law enforcement officers clarifies any ambiguity and makes it clear that he consented to the search which yielded the crack cocaine and marijuana found in his car.

2.    **The Firearms Evidence Seized from Ms. Hemingway's Bedroom Also Was**

14

## Lawfully Seized Pursuant to a Consent Search:

Franklin does not deny that Ms. Hemingway consented, orally and in writing, to a search of her apartment. Rather, he contends that he did not give his consent to such a search and "believe[s]" that an officer nevertheless "told Ms. Hemingway that I had consented to a search of the apartment and that, as a result, Ms. Hemingway gave her consent to a search." Affidavit of Defendant at para. 6. Not only has Franklin not offered an affidavit from Ms. Hemingway on this point, but Ms. Hemingway's sworn grand jury testimony contradicts the defendant's claim: Ms. Hemingway testified that she gave a voluntary and intelligent consent to a search of her apartment **before** overhearing one law enforcement officer reporting to Detective Fratalia that Franklin had added his consent to her own. Hemingway Tr. at 23.

For all the reasons already set forth in connection with the search of Franklin's car, the government submits that Franklin also consented thereafter to a search of his girlfriend's apartment (perhaps after being told that she had already consented to the search herself). In any event, even if one assumes *arguendo* that Franklin withheld (or meant to withhold) his consent, Ms. Hemingway's consent alone was a sufficient basis for the search that was then conducted. It is well settled that each adult individual who enjoys access to and control over property, independently of other persons who may enjoy equal access and control, has the authority to consent to a search of that property. See, e.g., United States v. Matlock, 415 U.S. 164, 171-172 n.7 (1974); United States v. McCarthy, 77 F.3d 522, 535 (1st Cir. 1996) (defendant assumed risk that man with whom he was staying would consent to search of room where defendant kept unlocked suitcase; defendant did not have exclusive access to room and left suitcase there after trailer owner told him to move out); United States v. Infante-Ruiz, 13 F.3d 498, 504 (1st Cir. 1994) (driver of automobile, in which

defendant was passenger, had authority to consent to search of briefcase because driver had access to briefcase for several days, his property inside briefcase commingled with defendant's, and briefcase was in automobile's trunk); and United States v. Davis, 967 F.2d 84, 87 (2d Cir. 1992) (joint user of footlocker had common authority to consent even though defendant possessed only key).

In the instant case, Ms. Hemingway testified that Franklin had brought the safe to her apartment at her request in order to keep in it her valuables, such as jewelry, and important legal papers, such as birth certificates, Social Security cards and her apartment lease. Hemingway Tr. at 16-17. She testified that the safe was kept under her bed; that she accessed the safe whenever she needed to retrieve one of those items; and that she last recalled having done so in February or January of 2004 when she needed her son's birth certificate. Hemingway Tr. at 16-18. Although she recalled that the safe was normally kept closed (Hemingway Tr. at 18), it was from this opened safe that TFA MacLaughlin recovered the large capacity pistol magazine and the single bullet which Franklin now seeks to suppress. DEA-6 at para. 9. Based on the authorities cited above, it is clear that Ms. Hemingway's consent alone was a sufficient basis for a valid search.

### 3. Even Assuming *Arguendo* that the Drugs Were Not Seized Pursuant to a Valid Consent Search, They Were Lawfully Seized Pursuant to the Automobile Exception to the Warrant Clause:

Under the automobile exception to the Fourth Amendment's warrant requirement, first articulated in Carroll v. United States, 267 U.S. 132, 153 (1925), the only essential predicate for a valid warrantless search of a motor vehicle by law enforcement officers is "probable cause to believe that the [vehicle] contains contraband or other evidence of criminal activity." United States v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992)(citations and internal quotation marks omitted); United

States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000). Moreover, the automobile exception to the warrant requirement allows police to open and search containers found within the trunk of a car. See, e.g., California v. Acevedo, 500 U.S. 565, 579-580 (1991); United States v. Ross 456 U.S. 798, 806 (1982).

The original justification for the automobile exception was a vehicle's "ready mobility," an exigency sufficient to excuse the failure to obtain a search warrant once probable cause to conduct the search was established. Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); and California v. Carney, 471 U.S. 386, 390-391 (1985). Nevertheless, it is clear that the automobile exception does not have a separate exigency requirement. See Maryland v. Dyson, 527 U.S. 465, 466 (1999); and United States v. Panitz, 907 F2d 1267, 1272 (1st Cir. 1990). Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified the application of the automobile exception. See Carney, 471 U.S. at 388 and 393 (informant's tip that defendant was exchanging marijuana for sexual favors in his motor home parked in a public parking lot was sufficient basis for warrantless search of the motor home); Cady v. Dombrowski, 413 U.S. 433, 442 (1973); and United States v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992) (finding warrantless search of defendant's vehicle parked in a bank parking lot valid due, in part, to reduced privacy interest associated with a vehicle). The Supreme Court has ruled that the public expectation of privacy in automobiles has been substantially reduced due to the pervasive government regulation of automobiles. See Carney, 471 U.S. at 392; Cady, 413 U.S. at 442; and Panitz, 907 F.2d at 1271-72. Reasoning that, since vehicles are frequently stopped by police on a daily basis for such routine things as minor traffic violations or expired inspection stickers, the Supreme Court considers the public to be fully aware that it is accorded less privacy in its

17

automobiles. Carney, 471 U.S. at 392; Labron, 518 U.S. at 940; and Ross, 456 U.S. at 806. Consequently, so long as probable cause exists to believe that contraband may be found in a motor vehicle, a warrantless search may be justified upon the reduced expectation of privacy associated with vehicles. South Dakota v.Opperman, 428 U.S. 364, 368 (1976); Ross, 456 U.S. at 806.

In the instant case, Franklin had been seen leaving his girlfriend's apartment in the middle of the night to place a bag in the trunk of his car and he had started the car. Sometime later, when a tow truck stopped in the vicinity of Franklin's car, somebody was seen watching the tow truck with apparent interest from a window in Ms. Hemingway's apartment. After he was arrested and after having been advised of his Miranda rights, Franklin himself told TFA MacLaughlin and S/A Cashman that the bag he had placed in the trunk of his car contained at least one drug (marijuana) and that he had done so because he had been alerted by a telephone call that other Warren Gardens figures were being arrested. Based on just some of the foregoing information, let alone all of it, these DEA agents had ample probable cause to believe that evidence of a crime would be found in Franklin's car.

Nor does the fact that Franklin's car was parked in a legal visitor's parking space along the access road within the apartment complex alter the foregoing analysis. See, e.g., United States v. Brookins, 345 F.3d 231, 234 and 237-238 (4th Cir. 2003) (warrantless search of defendant's car was valid where police had seen defendant dealing crack cocaine from his vehicle, had attempted to arrest him, but he had fled the scene and parked his car at the home of his mother-in-law); United States v. Reed, 26 F.3d 523, 530 (5th Cir. 1994) (where a tracking device concealed in a bag of money stolen in a bank robbery led police to defendant's vehicle parked in the driveway of his home, warrantless search of vehicle was permissible, even though defendant and his wife had been arrested

in their home, because there might have been multiple sets of keys to the car and an accomplice could have removed the evidence from the vehicle); United States v. Foxworth, 8 F.3d 540, 545 (7th Cir. 1993) (informant tip that defendant's car contained drugs was sufficient to justify warrantless search of motor vehicle parked in a private motel parking lot which was readily accessible to the public and from which one of the defendant's associates could have moved the car at any time); United States v. Moscatiello, 771 F.2d 589, 599 (1st Cir. 1985) (warrantless search of defendant's vehicle parked in a stranger's private driveway permissible); and United States v. McClain, 531 F2d 431, 433-434 (9th Cir. 1976) (warrantless search of defendant's vehicle parked in a hotel parking lot valid, in part, because an accomplice could have tampered with the car).

Thus, even if one assumes for the sake of argument that Franklin had not consented to a search of his car, uncontestef facts clearly establish that the warrantless search was perfectly permissible under the automobile exception to the Warrant Clause and there is, therefore, no need for an evidentiary hearing on the consent issue.

4.    **The Evidence Seized from Franklin's Car and from His Girlfriend's Apartment Is Admissble by Application of the Inevitable Discovery Doctrine:**

Even if one assumes *arguendo* that the seizures made from Franklin's car were not permissible either pursuant to a consent search or under the automobile exception and that the seizures made from Ms. Hemingway's apartment were not the product of a valid consent, the drug and firearms evidence seized nevertheless is admissible under the inevitable discovery doctrine. That doctrine "applies to any case in which the prosecution can show by a preponderance of the evidence that the government would have discovered the challenged evidence even had the constitutional violation to which the defendant objects never occurred." United States v. Scott, 270

F.3d 30, 42 (1st Cir. 2001), citing Nix v. Williams, 467 U.S. 431, 440-448 (1984).

Once Franklin told TFA MacLaughlin and S/A Cashman that the bag he had placed in the trunk of his car the night before contained drugs (regardless of the fact that he mentioned only marijuana and that it was found to contain both marijuana and crack cocaine), the agents had probable cause to believe that his car, and specifically the bag he was observed placing in the trunk, contained contraband. Even if Franklin had not consented to a search of his vehicle, even if the agents had not acted in the belief that Franklin had consented to such a search, and even if the automobile exception did not apply, the agents would not have left the vicinity of Franklin's car before seeking and obtaining a warrant to search it.[9]  Once they had completed such a search of Franklin's car, if not before, they also would have applied for a warrant to search Ms. Hemingway's apartment. After all, Franklin had exited Ms. Hemingway's apartment carrying 430 rounds of ammunition. Since there was no gun in Franklin's car, and since it was apparent that Franklin had brought the drugs he had placed in the trunk of his car from Ms. Hemingway's apartment, the agents would have had probable cause to believe that a firearm would be found in Ms. Hemingway's apartment, probably to guard the drugs which Franklin kept there.[10]  In fact, even if Franklin had never said anything about what he had put in his car, the surveillance observations of Franklin placing a bag in his car in the middle of the night, coupled with the 438 rounds of ammunition he

---

[9]  Indeed, the federal prosecutor assigned to the investigation had arrived early at his office that morning for the specific purpose of being available to prepare any search warrant applications that might be needed in the wake of the arrests of Darren Franklin and other Warren Gardens defendants. See Affidavit of Task Force Agent Joao Monteiro attached hereto at Tab G.

[10]    The fact that such a firearm was found in Franklin's bedroom at his parents' apartment, rather than in Ms. Hemingway's apartment, does not detract from the fact that the information learned by the agents on the morning of Franklin's arrest gave rise to probable cause sufficient to support an application for a warrant to search his girlfriend's apartment.

was carrying when he surrendered and the arresting officers' knowledge of Franklin's extensive criminal background would have been sufficient to support an application to search his car for a firearm. The subsequent discovery of the drugs, and the absence of any gun in Franklin's car, would inevitably have led to a successful application for a warrant to search the apartment.

Based on the information known to the agents at the scene of Franklin's arrest, obtaining search warrants in the absence of consent or some other exception to the Warrant Clause was virtually a sure thing. See United States v. Procopio, 88 F.3d 21, 27 (1st Cir. 1996)(even though local police were found to have exceeded the scope of their department's inventory policy by opening closed briefcase recovered from vehicle of a defendant who had fled on foot when police tried to pull him over for an equipment defect, contents of briefcase were nevertheless admissible where local police already knew that defendant was object of a federal robbery investigation, would have contacted federal agents and federal agents would have obtained warrant to search the briefcase).

Accordingly, even in the absence of an application of the automobile exception, there is no need for an evidentiary hearing on the consent issue since the drugs seized from Franklin's car and the firearms evidence seized from his girlfriend's apartment[11] are admissible in any event by virtue of the inevitable discovery doctrine.

IV.                                **CONCLUSION**

For all the foregoing reasons, the government respectfully submits that Defendant's Motion to Suppress Evidence should be denied in its entirety.

---

[11]    It also should be noted that, in light of the fact that Franklin has not moved to suppress (and has no basis for moving to suppress) the 438 rounds of ammunition which he was carrying at the time of his arrest, the government does not anticipate seeking to introduce into evidence at any trial in this matter the other firearms evidence seized from the apartments of his girlfriend and of his parents.

## REQUEST FOR ORAL ARGUMENT

The government believes that oral argument may assist the Court, particularly in deciding whether any evidentiary hearing is needed to resolve this matter, and therefore requests that this Honorable Court schedule this matter for oral argument.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

PATRICK M. HAMILTON
Assistant U.S. Attorney
One Courthouse Way
Boston, MA 02130
(617) 748-3251

Date:   November 12, 2004

## CERTIFICATE OF SERVICE

I, Patrick M. Hamilton, do hereby certify that a copy of the foregoing was served by first-class mail upon Jonathan Shapiro, Esq., Stern, Shapiro, Weissberg & Garin, LLP, 90 Canal Street, Boston, MA 02114, counsel of record for defendant Darren Franklin.

Date:   November 12, 2004

Patrick M. Hamilton