Direct - MacLaughlin                                          26

1    Q    You say a platform, is it, it's wider than just a step?

2    It's like a landing, sort of an outside--

3    A    Yes, it's a landing.

4    Q    And then, is there another step and then--

5    A    There's one step down onto the common court, the courtyard

6    there.

7    Q    And did he place the bag and the keys down?

8    A    Yes.

9    Q    And what was he told to do?

10   A    Lay face down, and he was handcuffed, taken into custody.

11   Q    What, if anything, happened with respect to the bag?

12   A    The, one of the enter team officers, fearing for his

13   safety and the safety of the other officers, leaned over and

14   looked into the open bag, and he determined, just by looking

15   inside, in plain view, that he could see boxes of pistol

16   ammunition.

17   Q    What happened with that bag and the ammunition inside it?

18   A    That was taken into custody by the ATF.

19   Q    Have you learned roughly how many rounds of ammunition

20   were in that bag?

21   A    As I understand, between four and five hundred.

22   Q    Are you ware of whether or not any preliminary examination

23   has been made by somebody from ATF?

24   A    No, I'm not.

25   Q    Are you aware of whether or not any examination's been

Direct - MacLaughlin                                    27

1    done to determine if any of the cartridges or rounds of

2    ammunition were made in Massachusetts or came from out of

3    state?

4    A    I understand they're all from out of state.

5    Q    Was any search conducted of Mr. Franklin's girlfriend's

6    residence?

7    A    Yes, it was.

8    Q    Who, how was, how was permission, to conduct the search

9    obtained?

10   A    Boston Police Detective Robert Fratalia asked her if she

11   would consent to a search of the apartment because we were

12   looking for guns, and she, she consented to that.  She signed a

13   form.

14   Q    Did anyone speak to the defendant about a search of the

15   apartment?

16   A    Yes, I did.

17   Q    Was this after, the girlfriend's permission had been

18   obtained?

19   A    Yes.  We obtained permission from Tanya Hemingway who has

20   the apartment, and then I went down and spoke to Mr. Franklin

21   and asked if him we could get permission from him to search his

22   apartment.

23   Q    Before asking him any questions, do you know if he was

24   Mirandized?

25   A    Yes, I did.

Direct - MacLaughlin                                    28

1   Q    You Mirandized him?

2   A    I did, yes.

3   Q    After you Mirandized him, did you, what, if anything, did

4   you say about the search of the apartment?

5   A    We told him that we had, we wanted to search the apartment

6   that, that he came out of with the ammunition and that we had

7   gotten permission from his girlfriend, and that I would like to

8   get also his permission.  I asked him if he, if he pitched in,

9   did he pay any of the rent or whatnot.  He said he helps out

10  from time to time, and he said go do what you've got to do.

11  Q    The search of the apartment yield any evidence?

12  A    Yes, it did.

13  Q    What?

14  A    There was a, we found, I found in an unlocked safe which

15  was under the main, the bed in the main bedroom, in an unlocked

16  safe, a high-capacity, semi-automatic pistol magazine, and one

17  round of 40 caliber ammunition.

18  Q    At, did you at any point in time have any conversation

19  that morning with Mr. Franklin about the bag you'd seen him, or

20  he'd been seen putting in the car in the middle night?

21  A    Yes, we did.

22          THE COURT:  Can I just interrupt for a little?

23          MR. HAMILTON:  Sure.

24          THE COURT:  You said magazine, not the pistol itself,

25  but the magazine?

Direct - MacLaughlin                    29

1          THE WITNESS:  Magazine, your Honor, that's correct.

2          THE COURT:  Okay.

3   BY MR. HAMILTON:

4   Q    I'm sorry, you did have a conversation with him?

5   A    Yes, we did.

6   Q    And this was after he was placed under arrest?

7   A    Yes.

8   Q    Was this after you had already Mirandized him?

9   A    That's correct.

10  Q    What, if anything, did you say to him, and what did he say

11  to you about the bag in the car?

12  A    Well, we asked him, he was asked why he, why he brought

13  the bag out at 1:30 in the morning and put it in his car, and

14  he didn't answer that directly.  He said that he had received a

15  phone call during the night that some of his boys were

16  disappearing off the street, and he, he said he knew we were

17  coming for him, so that's why he put that bag in the, in the

18  car.  I asked him what was in the bag, and he told me it was

19  weed.  And I asked him, could we, did he, does he mind if we

20  search the car, can we get consent to search the car, and he

21  paused and he said, go do what you've got to do.

22  Q    Who searched the car?

23  A    Myself and Special Agent Cashman from the DEA.

24  Q    What, if anything, was found in the car, particularly in

25  the trunk of the car, where you'd seen him, where he'd been

1  seen putting the bag?

2  A    In that bag we found approximately 66 grams of crack

3  cocaine, approximately 92 grams of marijuana.

4  Q    How were, how were those items contained?  What were they,

5  what were they contained in?

6  A    The crack cocaine was in three separate bags, as I recall.

7  And the marijuana was, plastic bags, and the marijuana was in

8  plastic bags also.

9  Q    Between the time, I'm sorry, where, other than, were, were

10 those items found within a shopping bag?

11 A    Yes.

12 Q    Were any other shopping bags, other than that shopping bag

13 in the trunk?

14 A    No.

15 Q    Between the time Darren Franklin had been seen accessing

16 the trunk of the car around 1:30 and the time of the search of

17 the car, had the vehicle been kept under surveillance?

18 A    Constantly.

19 Q    Had anybody else accessed the vehicle?

20 A    No.

21 Q    To your knowledge, was a search conducted at his mother's

22 residence?

23 A    Yes.

24 Q    Is that the 370 Chestnut West in Randolph?

25 A    That's correct.

Direct - MacLaughlin                                31

1   Q    How, how was permission obtained to conduct that search?

2   A    On a consent form.

3   Q    From whom?

4   A    From Emily Franklin.

5   Q    The defendant's mother?

6   A    Yes.

7   Q    What, if anything, was found in the search of those

8   premises?

9   A    There was some crack cocaine and some powder cocaine found

10  in a, a locked safe.

11  Q    Was any, were there any firearm related evidence found

12  there?

13  A    Inside the safe, there was a 45 caliber Glock,

14  semi-automatic pistol.  There wasn't any round in the chamber

15  but the magazine was full.

16        MR. HAMILTON:  No further questions, your Honor.

17        THE COURT:  Mr. Shapiro, before you start, Maria,

18  what time, how long do you think you'll be cross-examining?

19        MR. SHAPIRO:  Maybe half hour.

20        THE COURT:  I can, I see Mr. Heinrich here.  Is

21  Mr. Barron here?  Why don't you just, why don't you tell him to

22  come back around 3:30, unless you'd like to sit here and watch?

23        MR. HEINRICH:  As interesting as I find this, your

24  Honor, I'll come back in about half an hour.  Our matter will

Cross - MacLaughlin                                                            32

1   only be five minutes.

2               THE COURT:  I know it will.

3               MR. HEINRICH:  Okay.

4               THE COURT: Go ahead Mr. Shapiro.

5               MR. SHAPIRO:  Thank you, your Honor.

6                         CROSS EXAMINATION

7   BY MR. SHAPIRO:

8   Q    Good afternoon, Agent MacLaughlin.

9   A    Good afternoon.

10  Q    Now, Agent MacLaughlin, you're the co-case agent on, in

11  this investigation?

12  A    That's correct.

13  Q    And this was a year-long investigation from, I think you

14  said, spring of 2003 to spring of 2004?

15  A    That's correct.

16  Q    And is the investigation concluded with the arrest of

17  defendant and others?

18  A    That's correct.

19  Q    And, am I correct that the, the only time during this

20  entire investigation that Mr. Franklin was observed, were on

21  the occasions noted in the indictment?

22  A    No, that's not correct.

23               THE COURT:  Observed, or observed, telling--

24               MR. SHAPIRO:  Observed, observed in a narcotics

25  transaction?

Cross - MacLaughlin                                          33

1  A    That's not correct.

2  BY MR. SHAPIRO:

3  Q    So, you're saying that there are other transactions, which

4  you haven't indicted, which Mr. Franklin hasn't been indicted

5  for despite the fact that, that he was observed?

6  A    That's correct.

7  Q    And, is it fair to say that he hasn't been indicted on

8  those other occasions because the evidence isn't sufficient to

9  prove that he committed any crime?

10         MR. HAMILTON:  Objection, your Honor.

11         THE COURT:  Sustained.  I've no reason, we don't even

12  know if it was presented to the grand jury.  We don't know if

13  it present, I, I assume that if it's presented, and, it would

14  have been a no bill of some sort, but I haven't seen a no bill

15  around here in a long time.

16  BY MR. SHAPIRO:

17  Q    Have you prepared any reports concerning any of the

18  observations about which you've testified today?

19  A    Yes.

20  Q    Do you have those reports with you?

21  A    It's not complete.

22  Q    Do you have it with you?

23  A    No.

24         MR. SHAPIRO:  I would request that that report be

25  produced--

Cross - MacLaughlin

34

1          THE COURT:  Mr. Hamilton?

2          MR. HAMILTON:  It's my understanding that the, that

3 the witness is in the process of preparing a report.

4          THE COURT:  But, but as to those which have been

5 prepared?

6          MR. HAMILTON:  But it's, it's my understanding that

7 there's no complete report that this witness has prepared.  The

8 only one is that, with the, as I told Mr. Shapiro when he asked

9 me earlier today, the only one he did, he's begun preparing is

10 relative to the arrest and that is not complete.

11          THE COURT:  Mr. Shapiro?

12          MR. SHAPIRO:  Well, Judge, I think I'm entitled to--

13          THE COURT:  You're entitled--

14          MR. SHAPIRO:  If he's prepared a, you know, a report

15 about some of the observations that he's testified to but

16 hasn't done others, I think I'm entitled to what he's, he's

17 completed.

18          THE COURT:  Objection, is, I mean, you're not going

19 to get it.  You'll get a full report, but a half report does

20 nothing.

21          MR. SHAPIRO:  Okay.

22 BY MR. SHAPIRO:

23 Q    Now, were you present during the observations on Copeland

24 Street and Rockland Street about which you've testified?

25 A    Yes, sir, I was.

Cross - MacLaughlin                    35

1   Q    And where were you?

2   A    I was in a surveillance van.

3   Q    In a surveillance--

4   A    In a surveillance van.

5   Q    -- van.  And in relationship to the videotape that had

6   been shown, where in relation to the place where Mr. Franklin's

7   van pulled up did, were you located?

8   A    We were moving around, several different spots.  It was,

9   at that particular time, I can't recall exactly where we were.

10           THE COURT:  Were you, you weren't stationary then?

11           THE WITNESS:  I'm sorry, your Honor?

12           THE COURT:  You were not stationary during the whole

13  transaction?

14           THE WITNESS:  We would find a good spot and then move

15  to another spot, because we thought we were being compromised.

16  We had to keep moving the van around.

17  BY MR. SHAPIRO:

18  Q    Okay.  What, did you make any observations of Mr. Franklin

19  on July 10th?

20  A    No.

21  Q    Oh.  So everything you've testified to about observations

22  made involving Mr. Franklin is on the basis of something you'd

23  been told by somebody else?

24  A    That's correct.

25  Q    And did you review that person's report?

Cross - MacLaughlin                         36

1   A    No.

2   Q    Did that person prepare a report?

3   A    Yes.

4   Q    And who is that?

5   A    Officer, Task Force Agent Monteiro.

6   Q    And that's your co-case agent?

7   A    That's correct.

8   Q    And so he prepared, she, he prepared a report concerning

9   these observations, right?

10  A    That's correct.

11  Q    You reviewed that report, correct?

12            THE COURT:  No, he said he did not review that

13  report.

14  BY MR. SHAPIRO:

15  Q    You didn't review, you've never reviewed that report?

16  A    No.

17  Q    And so, without the report, Mr. Monteiro or Agent Monteiro

18  told you about what happened?

19  A    Yes, sir.

20  Q    Did you take notes?

21  A    No.

22  Q    And when did he tell you about this?

23  A    Within the last two days, we've been talking about it,.

24  the last two or three days, actually.

25  Q    Well did you, at some point, did you sit down and he go

1   over specifically everything that he observed?

2   A    Yes.

3   Q    And you remembered everything that he told you and then

4   you just repeated to us today, what he told you?

5   A    I don't know if I remembered everything he told me, but

6   yes, what I said today is something that he told me.

7   Q    And at no point, have you reviewed anything in writing

8   involving any of these, your statements, your testimony today?

9   A    No, that's not true.

10  Q    Oh, so you have.  What have you?

11  A    I've reviewed several things.

12  Q    What have you reviewed?

13  A    An affidavit that was prepared by the U.S. Attorney's

14  office, a chart.

15  Q    By an assistant U.S. attorney?

16  A    Yes.

17  Q    Concerning, concerning the matter about which you've

18  testified?

19  A    Yes.

20  Q    I'd like that produced.

21       THE COURT:  Mr. Hamilton?

22       MR. HAMILTON:  Your Honor, I did not bring a copy

23  here, but to clarify, the agent did--

24       THE COURT:  Well, wait a minute, no, no, you can't

25  clarify it like he testified to.

Cross - MacLaughlin                                  38

1          MR. HAMILTON:  Um.--

2          THE COURT:  Do you have the affidavit he reviewed

3   before he testified?

4          MR. HAMILTON:  I didn't, oh, I'm sorry, I'm sorry, I

5   think I've got it.

6          THE COURT:  Is that an affidavit in support of a

7   search warrant?

8          MR. HAMILTON:  No, your Honor.  This was submitted in

9   other detention hearings--

10          THE COURT:  All right.

11          MR. HAMILTON:  -- in which the witness has been a,

12   the witness--

13          THE COURT:  Why don't you show it to Mr. Shapiro?

14   BY MR. SHAPIRO:

15   Q   In addition to, well, this is an affidavit that you

16   prepared?

17   A   I signed it.  I wrote it and signed it.

18   Q   So this is your statement.  This is your statement.

19          THE COURT:  Well--

20   BY MR. SHAPIRO:

21   Q   Isn't that right?

22          THE WITNESS:  Is that a question?

23          THE COURT:  He said he signed it.  Whether it's,

24   you're using legal jargon.

25          MR. SHAPIRO:  All right.

1      THE COURT:  He said it's his--

2          MR. SHAPIRO:  Well--

3          THE COURT:  -- he's read and signed it.

4          MR. SHAPIRO:  I'm just, I'm just trying to clarify.

5  BY MR. SHAPIRO:

6  Q    A little while ago, I asked you whether you had made any

7  written reports concerning anything--

8          THE COURT:  That's not a report, let's go.

9          MR. SHAPIRO.  Okay.

10         THE COURT:  Let's go, Mr. Shapiro.  He signed it.

11 That's his statement, but it's not a report, at least in the

12 jargon of the police department and the task force.

13 BY MR. SHAPIRO:

14 Q    Agent MacLaughlin, you indicated that certain of these

15 areas were win, within one thousand feet from the George Lewis

16 School?

17 A    I did say that, yes.

18 Q    Okay, did you measure?

19 A    No, sir.

20 Q    Okay.  Do you know who did?

21 A    I believe it was Detective Sergeant Bowman from the Boston

22 police.

23 Q    And, do you know from what point he measured from and to?

24 A    No, sir.

25 Q    On this map here, where it says 16 Rockland, is that the

Cross - MacLaughlin                                    40

1   immediate location where the transaction about which you

2   testified took place?

3   A    It was in that area.  Actually a little further up, right

4   where your, where the pencil is now.

5   Q    This is Rockland Street--

6   A    As I understand.

7   Q    -- correct?

8   A    Sherman and Rockland, yes.

9   Q    And the videotape was taken over on Copeland Street?

10  A    That's correct.

11  Q    And this is the George Lewis school here?

12  A    Yes, I guess, yes.

13  Q    And, you don't, you don't know what, where the measurement

14  was made--

15  A    No, sir, I do not.

16  Q    -- with respect to 1,000 feet?

17  A    I'm sorry?

18  Q    With respect to 1,000 feet?

19  A    No, I don't.

20  Q    Do you know how he made the measurement?

21  A    No, sir.

22  Q    Did, other than this affidavit that you have signed, what,

23  if any other, written material, did you prepare or review,

24  relating to your testimony today?

25  A    None.

Cross - MacLaughlin                    41

1   Q    Did you observe at any time, the van about which you

2   testified, that is the van, which you were told that

3   Mr. Franklin was driving?

4   A    No.

5   Q    Did, did Agent Monteiro describe the van to you?

6   A    Yes, sir.  He did.

7   Q    And how did he describe it?

8   A    As a, as a Caravan, a dark colored Caravan.

9   Q    Anything distinctive about it that he mentioned?

10  A    The plate number, 10XB.  I don't remember if he said 01 or

11  03.  It was an Enterprise Rent-A-Car.

12  Q    Anything else about the vehicle that, that he described to

13  you?

14  A    Not that I recall.

15  Q    Size, color, number of doors, that sort of thing?

16  A    Like I said, a dark colored Caravan, and I know what that

17  looks like.

18  Q    Now, there was, in the indictment with which Mr. Franklin

19  is charged, there's also a, he's charged in one count with a

20  transaction on May 8, 2003.  Are you at all familiar with that

21  transaction?

22  A    No, sir.

23  Q    Do you know whether there was a videotape surveillance of

24  that--

25          THE COURT:  No.

Cross - MacLaughlin                         42

1          MR. SHAPIRO:  -- transaction?

2          THE COURT:  No, Mr. Shapiro.  There, there's no

3   evidence in concerning that transaction.  We're not going to

4   have, make this into a discovery concerning that transaction.

5   BY MR. SHAPIRO:

6   Q    Do you know the amount of crack cocaine that Mr. Franklin

7   is alleged to have possessed or distributed on May 8, 2003?

8   A    No, sir.

9   Q    On count three of the indictment charges that on March 12,

10  2004, Mr. Franklin distributed cocaine base, crack.  Are you at

11  all familiar with that transaction?

12  A    No, sir.

13  Q    Do you know the, the amount of any--

14          MR. HAMILTON:  Objection, your Honor.

15          MR. SHAPIRO:  -- crack or--

16          THE COURT:  No, he, he can have it, because the

17  maximum penalties which Mr. Franklin faces is relevant to the

18  question of detention.  So, if he, if he knows, he can answer,

19  if he doesn't know--

20  A    Can you repeat the question, please?

21  BY MR. SHAPIRO:

22  Q    The question was, do you know how much crack cocaine was

23  involved in the transaction with, in which Mr. Franklin was

24  alleged to have participated on March 12, 2004?

25  A    Not at this time, I don't, no.

Cross - MacLaughlin                                            43

1    Q    So, the only information you have was that, about which

2    you've testified, is that in the course of this entire

3    investigation, Mr. Franklin was involved in, in a distribution

4    of 1.3 grams of crack?

5    A    That's right.

6    Q    Now, you were, as I understand it, present at the time

7    that Mr. Franklin was arrested on April 15th?

8    A    Yes, sir, I was.

9    Q    And what time was that arrest made?

10   A    Somewhere around 4:30, quarter to five, I think.

11   Q    In the afternoon or in the morning?

12   A    Early in the morning, sir.

13   Q    And, how long had you been at that, at that location prior

14   to the arrest?

15   A    Sometime around 10:00 p.m., 9:30, 10:00 p.m.

16   Q    Is that the time at which the surveillance was set up,

17   initially?

18   A    Yes, sir.

19   Q    And beside yourself, who was, who was there?

20   A    My, my partner, Task Force Agent Monteiro, Special Agent

21   Michael Cashman from the DEA, Boston Police Detective Robert

22   Fratalia, group supervisor, he came in later, Mike Frabutti, he

23   came in a little later.

24   Q    Was there a video surveillance of that, of that occasion,

25   on that occasion?

Cross - MacLaughlin                                    44

1   A    No, sir.

2   Q    The, who made the call to Ms. Hemingway's apartment?

3   A    That would be a police officer by the name of Brian

4   Calhoon (ph).

5   Q    Were you on the line at any time or did you overhear any

6   conversation that took place?

7   A    No.

8   Q    Do you know if that officer talked to Mr. Franklin?

9   A    I believe that he did.

10  Q    Do you know what Mr. Franklin is alleged to have said, if

11  anything?

12  A    No.

13  Q    Do you know what the officer told Mr. Franklin?

14  A    I did hear him say, pick up the phone, that's the extent

15  of what I heard.

16  Q    Now you say that at some point in the early morning hours,

17  Mr. Franklin was seen to have put something in the trunk of the

18  car?

19  A    That's correct.

20  Q    And what exactly, did you observe that?

21  A    No.

22  Q    And, so how do you know about that?

23  A    Detective Fratalia told me that he saw him do that.

24  Q    And where were you at that time?

25  A    I was back, further back where I couldn't see the

Cross - MacLaughlin                45

1   apartment or the car.

2   Q    Were all of the, the officers in one location?

3   A    No.

4   Q    Where were you, in terms of, were you in a van, or a

5   cruiser?

6   A    I was in marked, an unmarked car down on Oak Street.

7   Q    Where were the other officers?

8   A    Robert Fratalia, Detective, Detective Fratalia was in the,

9   in the parking lot adjacent to Ms. Hemingway's apartment.

10  Special Agent Cashman was out on Oak Street.  Mike Frabutti was

11  driving around.

12  Q    And where was the, the blue Taurus located?

13  A    Parked on, on Pine Drive, adjacent to Tanya's apartment.

14  Q    And that was not, you couldn't observe the Taurus from

15  where you were?

16  A    No.

17  Q    So you were later told that, that something, that

18  Mr. Franklin had put something in it.

19  A    I was told by radio while he was doing it.

20  Q    But you didn't observe anything?

21  A    No, I did not.

22  Q    Was, did the officer describe to you at the time what it

23  was?

24  A    It looked like, he said it looked a shopping bag, a light

25  colored shopping bag that he had put in the car.

Cross - MacLaughlin                                    46

1   Q    And then, am I correct, after it was placed in the trunk,

2   you say that Mr., Mr. Franklin, you were told that Mr. Franklin

3   then went in the vehicle?

4   A    Yes, that's what I was told.

5   Q    And turned on the light?

6   A    Turned on the interior lights, yes.

7   Q    And, did what?  Was he observed doing anything?

8   A    Not to my knowledge, no.

9   Q    And then he went back upstairs and into the apartment?

10  A    That's correct.

11  Q    Now, was this, this was after he had gone somewhere in a

12  white vehicle and come back?

13  A    That's right.

14  Q    All right, after Mr. Franklin was ordered to come out of

15  the apartment, because there was an arrest warrant, at some

16  point, you say, he came out the door?

17  A    Yes, he did.

18  Q    And he was carrying keys in one hand and a bag in the

19  other hand?

20  A    That's right.

21  Q    And, to the best of your recollection, exactly what

22  happened at that point?

23  A    I'm, I'm, I'm testifying to what I was told.  I couldn't

24  see.  He came out.

25  Q    Oh, so you weren't there?

Cross - MacLaughlin                                    47

1   A    I was there.  I was in the parking lot.

2   Q    Was that behind the apartment?

3   A    At the rear of the apartment.

4   Q    All right, so you were at the rear, and again, you're

5   being told what happened?

6   A    That's right.

7   Q    So what were you told, to the best of your recollection,

8   what happened at that point?

9   A    He came out of the apartment door, onto the platform.  He

10  was instructed by the enter team officers, put the bag down,

11  and lay down on the ground, and then he was taken into custody.

12  Q    So, once he laid down on the ground, then what happened?

13  A    As I understand it, he was handcuffed.

14  Q    Okay, and was he then placed in a cruiser?

15  A    No.  They walked him out to the parking lot, and he stood

16  in the parking lot with myself, and Special Agent Cashman and

17  other police officers.

18  Q    And, all right, so he was ordered down.  At some point,

19  was he ordered to crawl away from the, the bags that he had, he

20  had place down there, and the keys?

21  A    Not to my knowledge.

22  Q    All right, so then, when he was in the back with you, he

23  was handcuffed and just standing there, correct?

24  A    That's correct

25  Q    At some point, what then happened with the, the bag that

1  he had put down?

2  A    Officer Timothy Calhoon from the enter team went over to

3  the bag and looked in it.  And he could see through the opening

4  of the bag that there were boxes of ammunition in the bag.

5  Q    Okay.  Now, this is after Mr. Franklin had been

6  handcuffed?

7  A    That's correct.

8  Q    And taken away?

9  A    Yes, sir.

10 Q    Okay, in your testimony, initially, you indicated that

11 this officer feared for his safety?

12 A    That's what he said, and the safety of the other people?

13 Q    And, and why was that?  He saw a, he feared for his safety

14 and the safety of other people from a plastic bag?

15 A    Yes, from the contents of the plastic bag.

16 Q    What, what did he think, that there was a bomb in it?

17 A    He could have, I guess.

18 Q    Was there any evidence that there were bombs involved in

19 this investigation?

20        THE COURT:  No, no, Mr. Shapiro.  Whether, we're,

21 we're not going to go into that.

22        MR. SHAPIRO:  Okay.

23        THE COURT:  I mean, he was told by the, the other

24 officer, that he had feared.  You know, only the other officer

25 can tell you that.  It's not relevant to this proceeding here

1    before me today.

2    BY MR. SHAPIRO:

3    Q    And then, had Mr. Franklin also put down the keys he was

4    carrying?

5    A    As I understand it, yes.  Like I said, I wasn't there.  I

6    didn't see that part.

7    Q    Okay then.  Were you told what happened with the keys and

8    the bag next?

9    A    I went over, and it was given to me.  The bag was left

10   there, and I went over and looked in it.  The keys were given

11   to me.  I gave them to Tanya.

12   Q    Okay, so you then came around in the front?

13   A    That's right.

14   Q    With Mr. Franklin?

15   A    No, he was still down in the parking lot.

16   Q    And who was he with?

17   A    Special Agent Cashman.

18   Q    Okay.  Then at some point, you say you had some

19   conversation with Mr. Franklin?

20   A    That's correct.

21   Q    When did that take place?

22   A    In the parking lot.

23   Q    That is before you went into the front?

24   A    No, it was after.

25   Q    All right.  So, Mr. Franklin was brought back handcuffed

1    to the parking lot to where you were?

2    A    Yes.

3    Q    Didn't have any conversation with him?

4    A    I advised him of his rights, told him who I was, what we

5    were doing there, and that was the extent of that conversation

6    at that particular time.

7    Q    Okay. You say you advised him of his rights, who you

8    were, and what you were doing. What did you tell him you were

9    doing there?

10   A    We were here from, to, with a federal arrest warrant.

11   Q    Okay. Okay. Then you went back in the front?

12   A    Yes, sir.

13   Q    And that's when you, you did what?

14   A    I became aware of the bag. He told me there was a bag out

15   here, I should come and look in it. It was, I looked in it.

16   It was full of ammunition.

17   Q    And what did you do?

18   A    I just left it there for the time. Then Robert, Robert

19   Fratalia came over to get it, and take a look at it.

20   Q    And, you picked up the keys and you gave them to

21   Ms. Hemingway?

22   A    Somebody picked them up and handed them to me, and a cell

23   phone. One of, one of the enter team guys handed me the keys

24   and a cell phone, and I in turn handed them to Tanya Hemingway.

25   Q    Did you know Ms. Hemingway?

1   A    No.

2   Q    How, how did you know to, to give her these things?

3   A    She was pointed out to me as being his girlfriend, and she

4   had two little kids there with her.

5   Q    What did you do next?

6   A    I went down to talk to Mr. Franklin.

7   Q    Okay. Who was still in the back of the apartment?

8   A    He was in the parking lot with Cashman.

9   Q    And so, describe that conversation.

10  A    We, there was, there was some time lapsed where nothing

11  was really being said, and we determined that we should do a

12  consent search at the apartment, for a couple of reasons, that

13  the ammunition had come out, and just based on the warrant that

14  we had, maybe get a consent search to look in that apartment.

15  Well Detective Fratalia was talking to Ms. Hemingway about

16  that. So I went down to talk to Mr. Franklin about the same

17  thing. Fratalia had gotten permission from Ms. Hemingway, to

18  get, to search the place, and he suggested we should get

19  permission from Mr. Franklin because he lives there with her.

20  So I went down and asked him about that, and he, I asked him

21  do you, do you kick into the apartment? Do you, do you pay

22  into what's going on here? And he said yes, I help out. And I

23  said, well we, I want to get permission from you to search your

24  apartment, consent to search your apartment, and he said, yes,

25  go ahead, do what you've got to do.

Cross - MacLaughlin                                    52

1   Q    Now did you tell him why you wanted to search the

2   apartment?

3   A    I think we were talking about guns and we thought there

4   might be a gun around, up in there, and I talked to him about

5   the little kids, that he has living there.  If there's a gun

6   there, he should give it up, because if there's a gun there, in

7   fact, and one of those little kids finds it six months from

8   now, the consequences could be quite severe.  So that's one of

9   the reasons that we were trying to get his consent to search.

10  Q    Okay, did you tell him anything else other than that you

11  wanted to, other than that you wanted to look for a gun?

12  A    We got talking about the bag that he put in the car, and

13  why, why did he put the bag in the car.  And he said that he

14  had gotten a phone call during the night from one of his boys

15  that he, that told him that some of the guys around the way

16  were getting picked up by the police and so he put the bag in

17  the car, and that's why he came out with the ammunition,

18  because he didn't want it finally got caught up with ammunition

19  in the house, that's why he was bringing it out to the police.

20  We asked him as to what was in the bag that he put in the trunk

21  and he said it was weed.  And I said do you mind if we look?

22  And he said no, do, do what you've got to do.  So we went and

23  looked.

24  Q    All right, now, I guess, my question specifically had been

25  when you were talking to him about getting consent to search

Cross - MacLaughlin                                    53

1   the apartment, did you, did you say anything other than that

2   you wanted to look for a gun or a firearm?

3   A     I don't recall anything else, no.

4   Q     And, my notes indicate that when you previously testified

5   about this conversation after you had asked, or told

6   Mr. Franklin about the, the warrant to look for a gun, he says

7   go do what you got to do, is that what he said?

8   A     That's what he said.

9   Q     Go do what you got to do, that what he, that's the best of

10  your recollection?

11  A     Yes.

12  Q     Okay.  And later when you said that you wanted to search

13  the car, he said essentially the same thing?

14  A     That's correct.

15  Q     Go do what you want to, what, what you got to do?

16  A     That's correct.

17  Q     And you understood that to be him giving you consent to

18  search?

19  A     Yes.

20  Q     Did you get a consent form?

21  A     No, I did not.

22  Q     You do have those forms, don't you?

23  A     Yes, we do.

24  Q     In fact, you had had Ms. Hemingway sign such a form,

25  didn't you?

Cross - MacLaughlin                                                          54

1    A    I didn't do that.

2    Q    Well, but the agents there had the forms.  They got her to

3    sign it--

4    A    That's correct.

5    Q    -- didn't they?  That's the practice, isn't it?

6    A    That's correct.

7    Q    And you do that whenever there's an issue, there may be an

8    issue of consent to make sure that you have that on paper,

9    right?

10   A    That's correct.

11   Q    But you didn't do that?

12   A    No, I didn't.

13   Q    Now did you search the apartment?

14   A    Yes.

15   Q    And did you find the pistol magazine?

16   A    Yes, I did.

17   Q    And that you said was under the bed in the master bedroom?

18   A    It was the upstairs bedroom that I asked Tanya where he

19   sleeps.  She showed us the bedroom.  It was in an unlocked

20   safe, under a bed.

21   Q    And this was in the safe?

22   A    Yes.

23   Q    And for what, what type of weapon, was it a magazine for?

24   A    I don't know.

25   Q    And you say it was, it was fully loaded?

*Maryann V. Young*
**Certified Court Transcriber**
**(508) 384-2003**

Cross - MacLaughlin                    55

1   A    I didn't say that.

2   Q    Was it, was it loaded?

3   A    No, it wasn't.

4   Q    Okay.  And then there was a spare or just a, a one round

5   lying there as well?

6   A    Beside it, yes, 40 caliber round.

7   Q    And did you search the vehicle?

8   A    Special Agent Cashman did that.

9   Q    Okay, and--

10  A    I opened the trunk.  He did the rest of the work.

11  Q    How, how did you get the keys?

12  A    From Tanya.

13  Q    And what if any conversation did you have with

14  Ms. Hemingway about getting the keys?

15  A    I just asked her for the keys and she gave them to me.

16  Q    Did you tell her why you wanted the keys?

17  A    I don't know if I did or not.

18  Q    In other than the trunk, was the rest of the car searched

19  as well?

20  A    Yes.

21  Q    Was anything found?

22  A    No.

23  Q    Do you know if the drugs that were allegedly found in the

24  trunk have been analyzed?

25  A    Not to my knowledge.

*Maryann V. Young*
**Certified Court Transcriber**
**(508) 384-2003**