U.S. Department of Justice
Drug Enforcement Administration

REPORT OF INVESTIGATION

*(Continuation)*

| | |
|---|---|
| 1. File No. ████ | 2. G-DEP Identifier ████ |
| 3. File Title ████ | |

4.
Page 7 of 8

5. Program Code

6. Date Prepared
04/20/2004

04-15-04. At the NEFD S/A Cashman ,and TFA Sgt. Grenham processed the Exhibit and secured it in the overnight drug depository. At a later date, the Exhibit was mailed to the Northeast Regional Lab, RRRMRR, for analysis and safekeeping.


## CUSTODY OF NON-DRUG EVIDENCE

1. Exhibit N-114 is an original disk containing photographs taken by S/A Cashman and TFA MacLaughlin on 4-15-2004 subsequent to the arrest of Darren FRANKLIN at 159 Pine Grove Drive in Brockton, MA. S/A Cashman turned the Exhibit over to TFA MacLaughlin. TFA MacLaughlin maintained custody of the Exhibit until it was processed and turned over to the DEA Non-Drug Evidence for safekeeping.

2. Exhibit N-115 is a Glock 45 caliber semi-automatic pistol seized from the bedroom of Darren FRANKLIN at 370 Chestnut West Apt.33-K in Randolph, MA on 04/15/2004. Lt.Hamelburg (Randolph PD) seized the Exhibit and turned over custody of the Exhibit to S/A Thurman (ATF). S/A Thurman maintained custody of the Exhibit until it was transferred to the ATF/Boston office for analysis. ATF will maintain custody of the Exhibit until further notice.

3. Exhibits N-116, N-117, N-118 and N-119 are, (1) ammunition box containing 38 special ammunition (Exhibit N-116), (1/2) ammunition box containing .357 rounds (Exhibit N-117, (1) box of ammunition containing .45 rounds (N-118), (1/2) box of ammunition containing .45 rounds (N-119). Lt. Hamelburg (Randolph PD) seized the Exhibits and turned over custody of the Exhibits to S/A Thurman (ATF). S/A Thurman maintained custody of the Exhibits until the Exhibits were transferred to the ATF/Boston office for analysis. ATF will maintain custody of the Exhibits until further notice.

4. Exhibits N-120 and N-121 consist of, (1) empty large capacity pistol magazine (N-120) and (1) .40 pistol bullet (N-121) seized from 159 Pine Grove Drive in Brockton, MA. TFA MacLaughlin seized the Exhibits and turned over the Exhibits to S/A Cashman. At a later time, S/A Cashman turned over the Exhibits to S/A Thurman (ATF). S/A Thurman maintained

DEA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |

| 4. Page 8 of 8 | 6. Date Prepared 04/20/2004 |
|---|---|
| 5. Program Code | |

custody of the Exhibits until the Exhibits were transferred to the ATF/Boston office for analysis. ATF will maintain custody of the Exhibits until further notice.

5. N-122 consists of a red and tan Nike shoebox, and a blue plastic Gillette shaving kit bag.  The exhibits were seized by S/A Cashman who turned them over to TFA Maclaughlin who maintained care and custody of them until they were delivered to the DEA Non-Drug Evidence Custodian.

6. N-123 consists of a DEA Form 88 consent to search signed by Fania HEMINGWAY and Boston PD YVSF Detective Robert Fratalia and dated 04-15-04.  The exhibit was acquired by BPD Detective Robert Fratalia who turned it over to TFA MacLaughlin who maintained care and custody of it until it was sealed in a DEA envelope and delivered to the DEA Non-Drug Evidence Custodian.

7. N-124 consists of a Town of Randolph, Ma. Police Department Permission to Search form, signed by Emily FRANKLIN, Preston McNeil, Lt. John Hamelburg, and Lt.Arthur Sullivan, dated April 15,at 6:23 AM.  The exhibit was acquired by Randolph PD Lt. John Hamelburg who turned it over to TFA MacLaughlin who maintained care and custody of it until it was sealed in a DEA envelope and delivered to the DEA Non-Drug Evidence Custodian.

## INDEXING

1.  FRANKLIN, Darren    -    NADDIS#

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

** TOTAL PAGE.09 **

E

# Boston Police

## Youth Violence Strike Force

### Miranda Warning

Name FANIA HEMINGWAY
Address 159 Pine Grove Dr
Date 4/15/04     Time 5:40

## Before We Ask You Any Questions, You Must Understand Your Rights.

You have the right to remain silent: FH
If you give up your right.
Anything you say can be used against you in a court
of law or other proceedings: FH

You have the right to talk to a lawyer for advice before
we ask you any questions and have him/her with you
during questioning: FH

If you cannot afford a lawyer and you want one, a lawyer
will be provided for you by the Commonwealth without
cost to you: FH

If you decide to answer questions now without a lawyer present,
you will still have the right to stop answering at any time until
you talk to a lawyer: FH

I, Fania Hemingway, have read and understand the above
rights as explained to me by Robert A. Pratelia and I am
willing to make a statement at this time without a lawyer being present.

SIGNATURE Fania Hemingway

WITNESSES Robert A Pratalia

**U.S. DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**

# CONSENT TO SEARCH

1.  I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT
    ADMINISTRATION TO SEARCH:  (Describe the person, places or things to be searched.)

    *159 Pine Grove Drive, Brockton, Ma.*

2.  I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY.

3.  I FREELY CONSENT TO THIS SEARCH.

_____4/15/04_____                    _Tiania Hemingway_
Date                                      Signature

                    Witnesses:            _Robert A Fratelin_

                                          _____

F

1

I
1 - 26

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES ATTORNEY

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

    VS.

JOHN DOE.

Case No.

Federal Grand Jury
U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts

Thursday
May 27, 2004

APPEARANCE:  PATRICK M. HAMILTON
             Assistant U.S. Attorney

WITNESS:    FANIA HEMINGWAY

*APEX Reporting*
(617) 426-3077

2

# I N D E X

WITNESS                                        PAGE

Fania Hemingway

    Examination by Mr. Hamilton          3

EXHIBITS   DESCRIPTION                         PAGE

None

HEMINGWAY - 05/27/04                          3

1                    P R O C E E D I N G S

2                                              (3:20 p.m.)

3                    FANIA HEMINGWAY, Sworn

4          MR. HAMILTON:  Please, have a seat and just be

5    aware that that flat thing is a microphone.

6          THE WITNESS:  Okay.

7          MR. HAMILTON:  It doesn't amplify your voice.  It

8    just records it, so--

9          THE WITNESS:  Okay--

10         MR. HAMILTON:  --you need to keep your voice up.

11         EXAMINATION BY MR. HAMILTON:

12    Q    Would you, please, state your full name and spell

13   your full name?

14    A    Fania Hemingway, F-A-N-I-A  H-E-M-I-N-G-W-A-Y.

15    Q    Have you, have you and I met approximately two

16   days ago and discussed your, your testimony here today?

17    A    Yes, we did.

18    Q    And did I go over with you at that time certain

19   rights that you had?

20    A    Yes, we did.

21         MR. HAMILTON:  I'm going to go over them again now

22   just for the record.  Okay?

23         THE WITNESS:  Okay.

24         MR. HAMILTON:  As you know, my name is Patrick

25   Hamilton.  I'm an Assistant U.S. Attorney, and I'm going to

1   be conducting your examination by asking you questions

2   today, and, in addition, these members of the Grand Jury can

3   also ask you questions.

4           You are appearing before a Federal Grand Jury, and

5   it's conducting an investigation of alleged violations of

6   the drug laws and the firearm laws, federal drug laws and

7   firearm laws, specifically, as they relate to Darren

8   Franklin.

9           Under the Fifth Amendment of the United States

10  Constitution, you have a privilege to remain silent and to

11  refuse to answer any question asked of you if a truthful

12  answer to that question might tend to incriminate you; do

13  you understand that?

14          THE WITNESS:  Yeah.

15          MR. HAMILTON:  Did I go over that with you the

16  other day as well?

17          THE WITNESS:  Yes, you did.

18          MR. HAMILTON:  We also have a court reporter here,

19  and everything we say here in the Grand Jury is recorded.

20  Anything you say can be used against you or others in this

21  or other proceedings; do you understand that?

22          THE WITNESS:  Yes.

23          MR. HAMILTON:  Are you represented by any attorney

24  in connection with your appearance here today?

25          THE WITNESS:  No.

HEMINGWAY - 05/27/04                          5

1       MR. HAMILTON:  Have you been told previously that,

2   if you wanted to retain an attorney, you could, you could do

3   so, you could consult with an attorney?

4       THE WITNESS:  Yes.

5       MR. HAMILTON:  The, do you understand that if, at

6   any time during your testimony, if you wish to consult with

7   an attorney, the Grand Jury, if you ask them to, will give

8   you a reasonable opportunity to do that?

9       THE WITNESS:  Yeah.

10      MR. HAMILTON:  Do you also understand that, even

11  if you had an attorney with you here today, the attorney

12  would not be allowed to come in here and sit with you, but

13  would rather sit outside, and if you had questions and

14  needed to consult with your attorney, you'd have an

15  opportunity just to go out, talk to the attorney and then

16  come back in?

17      THE WITNESS:  Yes.

18      MR. HAMILTON:  Fair to say, you're accompanied by,

19  you came with somebody here today?

20      THE WITNESS:  Yes.

21      MR. HAMILTON:  Two days, you came with somebody

22  else; correct?

23      THE WITNESS:  Yes.

24      MR. HAMILTON:  Who'd you come with two days ago?

25      THE WITNESS:  My mother.

1    MR. HAMILTON:  Who'd you come with today?

2    THE WITNESS:  Emily Franklin.

3    MR. HAMILTON:  And who's she?

4    THE WITNESS:  Darren Franklin's mother.

5    MR. HAMILTON:  Do you understand the rights and

6  the procedures that I've explained to you?

7    THE WITNESS:  Yeah.

8    MR. HAMILTON:  Now, obviously, if I ask you any

9  questions that you don't understand, don't, you know, don't

10  hesitate to ask me to rephrase them or, or what have you.

11    BY MR. HAMILTON:

12    Q    How long have you known Darren Franklin?

13    A    Since mid September.

14    Q    Let me dir -- mid September of when?

15    A    2003.

16    Q    As, were you present when he was arrested on the

17  morning of April 15, 2004?

18    A    Yes, I was.

19    Q    As of that point, could you describe your

20  relationship with, what was your relationship with Darren

21  Franklin?

22    A    He was my boyfriend.

23    Q    You met him the prior September?

24    A    Yeah.

25    Q    And fair to say, you then began dating?

1      A    Um-hum.

2      Q    Where do you live, where did you live at that

3   time?

4      A    At 159 Pine Grove Drive, in Brockton.

5      Q    And that's where you were living on April 15th

6   when he was arrested?

7      A    Yes.

8      Q    Where had he been living, to your knowledge, at

9   that time?

10      A    What, in mid September?

11      Q    Yes.

12      A    With his mother and father.

13      Q    And where did they live?

14      A    In Randolph.

15      Q    Is it 370 West Chestnut or something like that?

16      A    Yeah.

17      Q    Over, as your relationship developed, did he begin

18   spending more and more time at your place?

19      A    Yes.

20      Q    When did he first begin spending time at your

21   place, and by that, I mean, particularly, overnight?

22      A    Like around Thanksgivingtime.

23      Q    By April 15th, again, the date of his arrest, in

24   an average week or month, whichever is more comfortable for

25   you, how many nights was he spending at your place versus

HEMINGWAY - 05/27/04                    8

1   elsewhere?

2       A    Like five nights a week.

3       Q    And for how long had that been the case prior to

4   April 15th?

5       A    Maybe since like January, February.

6       Q    The, to your knowledge, as of the date of his

7   arrest on April 15th, did he have, at his parents' home, was

8   there a room that had been, traditionally, his bedroom?

9       A    Yes.

10      Q    On April 15th, at least, did that room have a bed

11  in it?

12      A    No.

13      Q    Did it have something else that it turns he used

14  to sleep on?

15      A    Yeah, like a blow-up one that you can inflate and

16  deflate.

17      Q    But there wasn't a traditional bed with a

18  mattress--

19      A    No--

20      Q    --and box spring and so forth?  How would it be

21  determined, who determined whether he stayed at your place

22  or how often he stayed at your place and whether he'd be

23  there one night or not that night?

24      A    That was just something that, if he stayed at his

25  parents' house, no one really determined it.

1    Q    The, is it fair to say that you have a, you were

2  convicted, when were you convicted in Federal Court of a, of

3  an offense?

4    A    I got arrested in '98, and I was on Pretrial

5  Services for two years, so I'll say like 2001.

6    Q    And were you convicted, was it conspiracy that

7  you--

8    A    Yeah--

9    Q    --were convicted of, conspiracy to distribute what

10 kind of drugs?

11   A    Crack cocaine.

12   Q    And you were convicted?

13   A    Yeah.

14   Q    And what was the sentence you were given?

15   A    Five years probation.

16   Q    And when did that probation end?

17   A    February of '04.

18   Q    Do you have children?

19   A    Yes, I do.

20   Q    How many children?

21   A    Two.

22   Q    Their ages?

23   A    Seven and a half, five and a half.

24   Q    Fair to say, Darren Franklin, whom you just met

25 last September, he's not the father--

HEMINGWAY - 05/27/04                    10

1       A    No--

2       Q    --of either of those children; correct?  The, on

3   the night of April 14th, the night before he was arrested --

4   well, when do you, normally, go to bed on--

5       A    Between--

6       Q    --an average night--

7       A    --9:00 and 10:00.

8       Q    Do you remember if Darren Franklin was in your

9   home, in your apartment, when you went to sleep that night?

10      A    No, he wasn't.

11      Q    Did you wake up again later on that night?

12      A    Yes, I did

13      Q    Roughly, when?

14      A    Between like 11:00 and 12:00.

15      Q    How do you know it was that time?

16      A    Because of my cable.  I have a cable box right on

17  top of my TV in my bedroom.

18      Q    Is it fair to say your apartment is sort of a

19  split level?

20      A    Yes, it is.

21      Q    What's on the first floor, the first level of the

22  apartment?

23      A    Living room, dining area, kitchen.

24      Q    And what's on the second level?

25      A    Two bedrooms and a bathroom.

1      Q    And you were asleep in your bedroom?

2      A    Yeah.

3      Q    And when Darren stayed over, is that where he

4  slept, too?

5      A    Yes.

6      Q    Did you leave your bedroom and go to anyplace

7  else?

8      A    When I got up, I went downstairs to the kitchen.

9      Q    And did you see Darren Franklin then?

10      A    Yup.

11      Q    And what did you do or what did you see and did

12  you have any conversation with Darren when you were awake at

13  that point?

14      A    I just went downstairs and got something to drink;

15  then, I went back upstairs.

16      Q    The, did you have any conversation with him at

17  that time?

18      A    No.  He was on the phone.

19      Q    Did you hear his end of the conversation?

20      A    Yeah.

21      Q    Did you hear him have more than one conversation

22  while you were on the first level of your house?

23      A    Yes.  Two different conversations.

24      Q    What were you able to gather from hearing his end

25  of the conversation?

1      A    That two of his friends were arrested.

2      Q    And one of the calls, what was, what did you

3    understand the relationship to be between him and the person

4    no the other end of one of those calls?

5      A    One must have been a friend, and on the second

6    call, I'm believing it was someone's mother.

7      Q    What makes you believe that?

8      A    Just by the way he was talking to them, more

9    respectable, not using any slang, just talking. You can

10   tell it was an adult.

11     Q    And from these people, he was learning what?

12     A    That two people had got arrested.

13     Q    And these were two people associated with him?

14     A    Yes, I believe so.

15     Q    But you didn't discuss that with him at that

16   point?

17     A    No, I don't.

18     Q    At any time, you, you heard that and then went

19   back up to the room; correct?

20     A    Yeah.

21     Q    At any time between hearing those conversations

22   and the time the police officers came, arrested Darren

23   Franklin in the morning, did what they had to do and left,

24   did you, at any time, mention to any of the police officers

25   on the scene anything about the conversations you'd been

HEMINGWAY - 05/27/04                              13

1    hearing Darren Franklin having over the phone the night

2    before?

3        A    No.

4        Q    Either when you were going down to the kitchen or

5    coming back from the kitchen, going up to your bedroom, did

6    you notice anything near the stairs in your apartment?

7        A    Yeah, two bags.

8        Q    How, can you describe the bags?

9        A    One was a see-through bag that had a Nike box in

10   it, and another one was just a blue bag.

11       Q    The see-through, the one with the Nike box in it,

12   was that a shopping style bag?

13       A    It was more like a grocery store bag, like the

14   plastic bags--

15       Q    Okay--

16       A    --with a Nike box.  That's how I knew it was a

17   Nike box because you could see through it.

18       Q    And the other bag, I think you said, was blue or

19   not?

20       A    Yeah, blue.

21       Q    The, and was that a plastic bag?

22       A    No, that was, it was a plastic bag, but it wasn't

23   see-through.

24       Q    Okay.  How would you, what could you tell, if

25   anything, about the contents of that bag?

HEMINGWAY - 05/27/04                    14

1     A    That whatever was in it was, like the bag didn't

2  fall over.  The two handles, they were just stuck open.

3     Q    Did you make any other observations about those

4  two bags?

5     A    And that it kind of was stacked up high.  That's

6  it.

7     Q    And did you have any conversation with Darren

8  about those bags?

9     A    No.  I just asked him, I said, what are those

10  bags?

11         And he was like, I'm going to take them out when I

12  leave.

13     Q    Okay.  You went back to bed?

14     A    Yeah.

15     Q    At some point, did you become aware of the fact

16  that Darren came to bed?

17     A    Um-hum.

18     Q    Did the phone ring at some point in the fairly

19  early morning?

20     A    Yes, it did.

21     Q    Who answered the phone?

22     A    I did.

23     Q    And what did they say; what did you say?

24     A    Can I speak to Darren?

25         And I said, may I ask who's calling?

HEMINGWAY - 05/27/04                          15

1        And they said, Brian.  And I gave Darren the

2   phone.

3        Q    And what happened after you gave Darren the phone?

4        A    I asked him who it was.  He said he didn't know,

5   and he started getting dressed, and then the phone rang

6   again, and he answered it.

7        Q    Did you, eventually, learn who was making the

8   phone calls?

9        A    Yeah, because I heard someone calling from out my

10  bedroom window.

11       Q    And who was out there?

12       A    It was the Feds.

13       Q    Did Darren, eventually, leave the apartment?

14       A    Yes, he did.

15       Q    Any sense as to how long between the first call

16  and when he, eventually, left the apartment?

17       A    Maybe around like five minutes because he got

18  dressed, washed his face, brushed his teeth.

19       Q    Can you describe the area under your bed in the

20  master bedroom?

21       A    I have a platform bed, and in the front of my bed,

22  there's a, like a door, and you can open it, and under the

23  bed is used for storage area.

24       Q    There are some drawers or--

25       A    There's four drawers, two on each side.

HEMINGWAY - 05/27/04                    16

1       Q    Is there a space between some of those drawers?

2       A    Yeah.

3       Q    And what, if anything, occupies the space between

4    those drawers?

5       A    You can put anything.  It's like a storage space.

6       Q    And did you put something there?

7       A    There was a safe under there.

8       Q    And was there something blocking the safe from

9    view?

10      A    Yeah.  There's like a sliding door in front of the

11   bed.

12      Q    What, if anything, do you keep, who brought, well,

13   how did the safe come to be there?

14      A    Darren brought it.

15      Q    At whose request?

16      A    Mine.

17      Q    What did you ask him for?

18      A    To keep my personal, like my jewelry, me and my

19   daughter's jewelry, and personal papers, birth certificates,

20   Social Security cards, my lease for my apartment.

21      Q    What kind of container did you ask him to bring?

22      A    A file cabinet.

23      Q    And he brought a safe?

24      A    Yeah.

25      Q    A floor safe?


                        *APEX Reporting*
                         (617) 426-3077

HEMINGWAY - 05/27/04                17

1       A    Yup.

2       Q    What did you, did you end up keeping in that safe

3   the items you described?

4       A    Yeah.

5       Q    How big is the floor safe, roughly?

6       A    Maybe about like that big.

7       Q    Is that about, is that a foot or a little bit more

8   than a foot; what's that?

9       A    Not, maybe like a foot.

10      Q    Is that the width or the height?

11      A    No.  That's the width, and it's like maybe that,

12  like this wide, about that tall.

13      Q    Okay.  The, how often do you go into the safe?

14      A    Only when I need like my children's birth

15  certificate or my birth certificate for anything or Social

16  Security cards.

17      Q    Were you aware of Darren keeping anything inside

18  the safe?

19      A    No, I wasn't.

20      Q    Didn't he have a gold necklace?

21      A    Yeah.  Oh, yeah, the necklace, he kept in there.

22      Q    The, had you noticed any other items of Darren's

23  kept in that safe, the last time you noticed or--

24      A    No, I didn't--

25      Q    --any time?  The last, do you at all remember the

APEX Reporting
(617) 426-3077

HEMINGWAY - 05/27/04                    18

1   last time you accessed the safe prior to his arrest?

2       A    It had to be maybe February or January because I

3   needed my son's birth certificate to sign him up for Little

4   League.

5       Q    And when you, did you notice anything out of the

6   ordinary then in the safe?

7       A    No.  It was just me and my daughter's jewelry and

8   the paperwork.

9       Q    And was it a, a combination safe or a key safe?

10      A    Not a combination, like you put numbers in.

11      Q    Okay.  And when you, when you were last in it, did

12  you close it after you--

13      A    Yeah--

14      Q    --got the stuff out?  The, when you saw the safe,

15  was it normally kept closed?

16      A    Yup.

17      Q    When Darren got up that morning, did you see him

18  access the safe in any way?

19      A    No, I didn't.

20      Q    Okay.  Did you later learn -- well, strike that.

21  The, after Darren went outside, were you aware of what, if

22  anything, he took out with him?

23      A    Just the blue bag that was sitting downstairs.

24      Q    The, did you see, again, the bag with the Nike

25  box; do you have any idea what happened to it?

1        A    No, I don't know what happened to that box.

2        Q    The, do you, are you aware of him taking anything

3    else out of the house with him or out of the residence with

4    him?

5        A    No.  Just when I heard the police officer say that

6    he went out to his car between 1:00 and 1:25.

7        Q    When did you hear that?

8        A    After they arrested him, they called me back and

9    told me to get my children up and get them dressed and come

10   outside to the right.

11       Q    Okay.  After you got your children up, and you got

12   them dressed and you came outside of the apartment, Darren

13   was no longer in view; correct?

14       A    No.

15       Q    The, was anything given to you by the police after

16   Darren was arrested?

17       A    His cell phone and his keys.

18       Q    So, is it safe to say that he had taken those out

19   with him--

20       A    Yeah--

21       Q    --when he went out, and they were given back to

22   you?

23       A    Yes.

24       Q    Did there come a time when somebody asked you for

25   one of those back?


                        APEX Reporting
                        (617) 426-3077

1    A    Yes.

2    Q    What did they ask for?

3    A    The keys.

4    Q    And what, if anything, did they explain to you?

5    A    That Darren gave them consent to search his car.

6    Q    Did you see them search the car?

7    A    No, I didn't.

8    Q    Okay.  What happened after you gave them back the

9  keys; as far as you know, they went and searched the car?

10    A    Yes.

11    Q    What did you do after that?

12    A    I was standing still there, and then they told me

13  that me and my kids could -- because it was kind of cold, so

14  me and my kids went and sat with the door open on the steps.

15    Q    Did there come a time when somebody approached you

16  about, asking you for consent to search the residence?

17    A    Yes.

18    Q    Had they, did they say anything to you about what

19  Darren had had or what they had found or hadn't found

20  outside?

21    A    They asked me could they search my house because,

22  in the blue bag, there were bullets, so they asked for

23  consent to search my house, and I gave them permission.

24    Q    Did they indicate anything about whether or not

25  they'd found any, anything in the car--

1      A    No--

2      Q    --at that time?  Okay.  The, do you remember the

3    names of any of the people who spoke to you about whether or

4    not you would consent to a search?

5      A    Bobby Fratalia.

6      Q    And where did he do that; where'd you have that

7    conversation?

8      A    It was first outside, and then we moved to the

9    steps, and he asked me on the steps like right when you open

10   my front door, there's stairs to go to my upper level.

11     Q    Because, in fact, when you first open, there's,

12   there's nothing there except the stairs; correct?

13     A    Yup.

14     Q    So you have to go up the stairs to a landing in

15   order to get to the first level which has the kitchen, the

16   dining room--

17     A    The living room and the dining room, yes.

18     Q    And then you go up some more stairs to get to the

19   bedroom?

20     A    Yeah.

21     Q    Correct -- okay.  So, you say he spoke to you

22   first outside; then, he spoke to you about it when you were

23   sitting on the steps?

24     A    Yup, and then we went upstairs to my dining room

25   table so I could sign the consent form.

HEMINGWAY - 05/27/04                    22

1    Q    Where did the kids go?

2    A    The kids were sitting on the couch watching TV.

3    Q    The, where, and you were sit -- where did you sit,

4    at the dining room table--

5    A    Yeah--

6    Q    --to sign the consent form?

7    A    Um-hum.

8    Q    What, if anything, did he explain to you about

9    your rights with respect to the search of the apartment?

10   A    That I could have refused to not let them search,

11   and they would have had to go and request a search warrant.

12   Q    The, ultimately, did you agree to the search?

13   A    Yes, I did.

14   Q    Did you sign the consent form?

15   A    Yes, I did.

16   Q    Did you feel that, did you, did you feel that you

17   had the ability to say no?

18   A    Yeah, but I didn't see any reason to say no.

19   Q    Okay.  Were you feeling any undue pressure to sign

20   the form?

21   A    No.

22   Q    Okay.  So you feel you signed it freely and

23   knowing what your rights were?

24   A    Yup.

25   Q    Did they ask you any questions about Darren and

HEMINGWAY - 05/27/04                23

1    his relationship to the apartment, to the premises?

2         A    Yeah.   They just asked me, does he help, like does

3    help with any bills or anything?

4         Q    And what did you say to them?

5         A    He helps out sometimes, but I primarily pay the

6    bills.

7         Q    Do you know if they then went and got any, if they

8    talked to Darren about searching the apartment?

9         A    Yeah.   I later heard that.

10        Q    From whom?

11        A    From Bobby Fratalia or one of the other gentlemen

12   because I think someone two-wayed Bobby Fratalia's phone and

13   said that they asked for Darren's permission.

14        Q    And did they indicate that Darren had given his

15   permission?

16        A    Yes.

17        Q    The, are you aware of what, if anything, they

18   found during the search of your home?

19        A    I think a clip to a gun.

20        Q    And do you remember if they found a bullet as

21   well?

22        A    No, I don't remember that.

23        Q    Where do you understand they found the clip to the

24   gun?

25        A    They said in the safe.

HEMINGWAY - 05/27/04                                    24

1       Q    And is it your understanding that the safe was
2    open when they found it?
3       A    Yes, that's what they told me.
4       Q    The, have you, since his arrest, have you visited
5    Darren?
6       A    Yes.
7       Q    Have you spoken to Darren on the phone?
8       A    Yes.
9       Q    Have you discussed any of the events surrounding
10   the night or the morning of his arrest?
11      A    No.
12      Q    And has Darren said to you, at any time, that he
13   had not given consent to search the car?
14      A    No, he hasn't.
15      Q    And has he said to you, at any time, that he did
16   not give consent to search the house?
17      A    No.
18           MR. HAMILTON:  I have no further questions.  Do
19   any grand jurors have any questions?
20           (No response.)
21           MR. HAMILTON:  Hearing none, if you'd step outside
22   or if the witness may be excused?
23           GRAND JUROR:  Yes.
24           MR. HAMILTON:  If you'd come with me then, Fania,
25   I'll be right back with the last witness.

HEMINGWAY - 05/27/04                    25

1        (Whereupon, at 3:36 p.m., May 27, 2004, the

2   witness was excused.)

26

## CERTIFICATE OF REPORTER

This is to certify that the attached proceeding

before:   A FEDERAL GRAND JURY

in the Matter of:


UNITED STATES OF AMERICA

VS.

JOHN DOE



Place: Boston, Massachusetts

Date:   May 27, 2004


were held as herein appears, and that this is the original

transcript thereof.



OFFICIAL REPORTER (Signature)
Jody L. Perkins


*APEX Reporting*
(617) 426-3077

**G**

## AFFIDAVIT OF TASK FORCE AGENT JOAO MONTEIRO

I, Joao Monteiro, being duly sworn do hereby depose and state as follows:

1.    I am a Boston Housing Authority Police Officer assigned to the New England Field Division of the U.S. Drug Enforcement Administration ("DEA"). As a DEA Task Force Agent, I, together with my partner, DEA Task Force Agent George MacLaughlin, was the co-case agent responsible for the Warren Gardens investigation, which led to the indictment of Darren Franklin and sixteen other federal defendants.

2.    In the early morning hours of April 15, 2004, I was stationed in a mobile command center from which I helped coordinate the arrests of Darren Franklin and other Warren Gardens defendants, as well as related law enforcement activities.

3.    Beginning at 5:30 a.m. that morning, I was in telephone contact with Assistant U.S. Attorney Patrick M. Hamilton, who was then the only federal prosecutor assigned to the investigation. Not only did I speak to him while he was still at home, but I spoke to him again when he arrived at his office at the federal courthouse shortly after 6:00 a.m. that morning.

4.    Based on prior conversations and our conversations that morning, I was aware that AUSA Hamilton had arrived early at his office specifically in order to be available to prepare any search warrant applications that might be needed in the wake of the anticipated arrests.

5.    Throughout that morning, I was in touch with the various arrest teams, including TFA MacLaughlin, who participated in the arrest of Darren Franklin.  At some point that morning, I advised AUSA Hamilton that no search warrants would be needed in connection with any of the properties associated with Darren Franklin because consents to search those properties had been obtained.

Signed under the pains and penalties of perjury this 12th day of November, 2004.

JOÃO MONTEIRO
U.S. Drug Enforcement Admin.
Task Force Agent

2